**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0711n.06
Filed: September 29, 2006

**No. 05-6270**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Marc S. Craig, | ) | **O P I N I O N** |
| | ) | |
| Defendant-Appellant. | ) | |

**BEFORE:  GIBBONS, MCKEAGUE, Circuit Judges; and FORESTER, District Judge.***

**McKeague, Circuit Judge.**  Defendant-Appellant Marc Craig conditionally pled guilty to

bank robbery in violation of 18 U.S.C. § 2113(a) and was sentenced to life imprisonment.  Craig

appeals his conviction, arguing that the district court erred when it denied his motion to suppress

evidence obtained as a result of his arrest and his motion to suppress a show-up identification.  For

the reasons stated below, we affirm Craig's conviction.

## I.  BACKGROUND

On November 3, 2004, a man robbed the Washington County Bank in Johnson City,

Tennessee.  The victimized bank teller was Ms. Tabitha Ricker. The branch bank manager, Mr.

Bob Armstrong, was walking through the lobby as the robbery was occurring and noticed that

---

* The Honorable Karl S. Forester, United States District Judge for the Eastern District of
Kentucky, sitting by designation.

Ms. Ricker looked peculiar. Thinking perhaps that her "customer" had made inappropriate sexual comments to Ms. Ricker, Mr. Armstrong walked to a point behind the teller counter and looked at the customer. Although the man had his head tilted downward and was wearing a baseball cap, Mr. Armstrong was able to see a portion of the robber's face, as well as the clothing he was wearing. Of some significance was the robber's hat: the red baseball cap had on it a picture of the "Tasmanian Devil, " a Warner Brothers cartoon character. When the robber left the bank, Ms. Ricker immediately told Mr. Armstrong that she had just been robbed. Mr. Armstrong instructed that the police be called and immediately began to follow the robber, staying approximately thirty to forty feet behind him. Ultimately Mr. Armstrong lost sight of the robber somewhere in the parking lot. As Mr. Armstrong looked around the parking lot, he noticed an older white Nissan automobile leaving the lot, which at that time was the only vehicle moving. Almost immediately thereafter, Armstrong made contact with a police officer and gave a description of the car he observed, as well as a description of the robber and his clothes, which included blue jeans, a light shirt, and the Tasmanian Devil hat. The police officer promptly passed on that information to his dispatcher, and immediately thereafter every police officer in Johnson City was aware of it.

Officer Joe Harrah, an investigator with the Johnson City Police Department, heard the radio transmissions regarding the robbery, which included the description of the perpetrator, and the description of the vehicle the robber might be driving. Officer Harrah was on his way to the bank to assist with the taking of statements. When he was approximately five blocks from the bank, he noticed an older white Nissan pulling into the parking lot of a convenience store. He

observed the Nissan park in front of the store, and the driver get out and enter the store. Officer Harrah noticed that the driver had "hat hair " and was wearing a light shirt and blue jeans.

Officer Harrah pulled his car into the lot, exited his own vehicle, walked over to the Nissan, and looked into the vehicle, where he observed an open bottle of Budweiser beer sitting upright in the passenger seat. At almost that precise moment Craig exited the convenience store. Harrah asked Craig if he had any identification; he stated, " yes, sir," acting somewhat nervously as he did so. He began patting his pockets as if looking for identification, yet produced none. Craig began walking away from his car and toward Officer Harrah, prompting Harrah to again ask for identification; Craig continued to pat his pockets, but still produced no identification. At that point, Harrah mentioned the open bottle of beer in the car, telling Craig that it was unlawful to have an open container of alcohol in his car. Craig responded that he was unaware of that law. Harrah thereupon asked if he would pour it out, and Craig said he would do so. Craig walked to the passenger side of his car and opened the door. As he did so, a red hat fell out of the car onto the pavement; the hat bore the image of the Tasmanian Devil. Craig quickly picked the hat up and threw it back into the car. After seeing the hat, Harrah pulled his weapon and ordered Craig to lie upon the pavement; he then handcuffed Craig.

Approximately fifteen to twenty minutes after the robbery, Mr. Armstrong was asked to accompany officers to the convenience market to see if he could identify Craig as the robber. After reaching the parking lot of the convenience market, Armstrong observed Craig and identified him as the robber. Craig was taken to the police station and booked. During the

booking process, Craig was thoroughly searched and officers recovered the stolen money

(identifiable by serial numbers on certain bills) from Craig's right front pocket.

Craig was charged with bank robbery in violation of 18 U.S.C. § 2113(a). An indictment

was returned on November 16, 2004. Craig filed a motion to suppress evidence, a motion to

compel a lineup, and a motion to suppress identification testimony. The magistrate judge denied

Craig's motion to compel a lineup. An evidentiary hearing on Craig's motions to suppress was

held on January 7, 2005. The magistrate judge entered reports and recommendations that the

motions to suppress be denied. The district court adopted the reports and recommendations. The

district court also denied Craig's appeal of the magistrate judge's order denying Craig's motion

for a lineup. Craig entered into a conditional plea agreement reserving the right to appeal the

denials of his suppression motions. Craig was sentenced to life imprisonment on August 8,

2005. A timely notice of appeal was filed.

## II.  ANALYSIS

### A.  Standard of Review

In reviewing a district court's denial of a motion to suppress evidence, this court reviews

the district court's findings of fact for clear error and its legal conclusions de novo. *United States

v. Foster*, 376 F.3d 577, 583 (6th Cir. 2004); *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir.

2004). The evidence must be viewed in the light most favorable to the district court's decision.

*Foster*, 376 F.3d at 583. Factual findings by the district court are clearly erroneous only "when,

although there may be evidence to support it, the reviewing court on the entire evidence is left

with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)).

**B. Legality of Arrest**

Craig argues that there was no probable cause at the time of his arrest, thus making the arrest and subsequent search of his person and vehicle illegal. Therefore, Craig asserts that the district court erred when it denied his motion to suppress the evidence found as a result of the search and the show-up identification that resulted from his arrest. Craig does not dispute that if there was probable cause for his arrest, the subsequent search incident to that arrest was necessarily lawful. *See Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979); *United States v. Robinson*, 414 U.S. 218, 235 (1973); *Chimel v. California*, 395 U.S. 752, 762-63 (1969). Probable cause for an arrest exists when a person of reasonable caution would be justified in believing that the individual to be arrested has committed, is committing, or is about to commit a crime. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Probable cause is determined by the totality of the circumstances "from a law enforcement officer's perspective." *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993).

The district court held that when Officer Harrah first asked Craig for his identification, Harrah had a reasonable, articulable suspicion sufficient to justify a *Terry* investigative stop. At that point Harrah had seen Craig get out of a car that matched the description of the car in which the robber fled the scene. Craig himself was wearing blue jeans and a light shirt and Harrah observed that he had "hat hair." This was consistent with the description of the robber. Moreover, by the time Craig emerged from the store Harrah had observed an open bottle of

Budweiser in his car. Therefore, Harrah was certainly justified in asking Craig for his identification, informing Craig that it was illegal to have an open container of alcohol in a vehicle, and asking Craig to pour out the beer. The district court went on to hold that when Craig opened the door of the car and a red Tasmanian Devil hat fell out of the car, Harrah had probable cause to draw his gun and arrest Craig.

On appeal Craig argues that there was never probable cause for arrest and that any grounds for a *Terry* stop "dissipated" when he and his vehicle were thoroughly searched and no gun or cash was found. This argument fails. First, the fact that Craig fit the description of the robber, was driving a car that fit the description of the robber's car, and was at a location near where the robbery had taken place only a short time after the robbery occurred surely was sufficient to establish a reasonable suspicion that criminal activity was afoot to justify a *Terry* stop. Second, this reasonable suspicion ripened into probable cause when Harrah saw the red Tasmanian Devil baseball cap fall out of the car, a cap that was specifically described by the robbery victims. Indeed, such a series of occurrences was sufficient to lead a person of reasonable caution to believe that Craig had been involved in criminal activity. Accordingly, the district court correctly found that there was probable cause for arrest. Thus, Craig's argument that any basis for detention "dissipated" because the police did not find a gun or the money fails because Craig could be searched incident to a lawful arrest. The fact that Craig was not thoroughly searched until he was booked is immaterial; at that point, the money taken in the robbery was found in his front pocket.

Based on the facts found by the magistrate judge and adopted by the district court, the district court's conclusion that there was probable cause for Craig's arrest was not error. However, Craig challenges the finding of fact that Harrah arrested Craig only after observing the hat. According to Craig, the record contains "more credible evidence" that Harrah arrested Craig before seeing the hat and based only on the matching description of the car and the robber's clothing. According to Officer Harrah, he never went into the convenience store until after he had effected Craig's arrest, and he did so to inquire if Craig had disposed of anything in the store. Yet Defendant called as a witness Mr. Meskel, the owner of the convenience store. Meskel testified that Mr. Brahmrhatt, the clerk on duty, said that a "civilian" (referring to plain clothes Officer Harrah) came into the store and asked what Craig said or wanted, followed Craig from the store into the parking lot, and only then arrested Craig. Yet Meskel personally witnessed nothing; rather, the substance of his testimony concerned only what Brahmrhatt told him about the circumstances of Craig's arrest. After hearing all the testimony, the magistrate judge concluded that Harrah's testimony regarding the sequence of events was extremely credible and credited his version over that of the convenience store owner. One of the reasons for this was the fact that neither the convenience store owner nor his employee spoke English as his native language, and therefore their discussion about the events surrounding Craig's arrest was in English. Craig questions this conclusion by pointing out various supposed inconsistencies in the evidence that supposedly undermine Harrah's credibility.

This court will only overturn a factual determination if it was clearly erroneous. A factual finding is only clearly erroneous "when, although there may be evidence to support it, the

reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Foster*, 376 F.3d at 583 (quoting *Narvarro-Camacho*, 186 F.3d at 705). Having read all of the evidence in the record submitted on appeal, it is clear that this standard is not even close to being met. The report and recommendation contains a cogent explanation for why the magistrate judge found Harrah to be extremely credible. An examination of Craig's reasons why Harrah's testimony was not credible fails to persuasively undermine the magistrate judge's reasoning, let alone create a definite and firm conviction that a mistake was made.

The inconsistencies Craig points to in Harrah's own testimony and between his testimony and the other evidence are either imagined or inconsequential. First, Craig claims Harrah's testimony is inconsistent because he testified that Craig threw the beer bottle from his car in the trash but also testified that he arrested Craig as soon as the hat fell out of the car. Craig argues that this story is logically impossible (and therefore false) because Craig would not have had time to throw the bottle in the trash if he was taken to the ground immediately after the hat fell out of the car. Once again, however, Craig mischaracterizes the record. Harrah testified that Craig opened the door and the hat fell out on the ground. Then Harrah said "He picks [the hat] up, throws it back into the car; grabs the beer, proceeds to pour the beer out. That's when I pulled my weapon on him and ordered him on the ground." (JA 157-58). The convenience store owner testified that there was a garbage can right by the car. If Craig was pouring the beer out in the trash can, he could easily have dropped the bottle into the trash when ordered to get on the ground. Even tossing the bottle into the can is possible. Although we do not know exactly what happened, Harrah's story does not contain the inherent inconsistency which Craig claims.

Next Craig claims that Harrah's testimony is inconsistent with the dispatch log which indicated that before he even pulled into the gas station he radioed in that he was observing Craig wearing a red hat. Another officer stated that he heard Harrah on the radio say that he had a suspect wearing a red hat. Harrah testified that he only radioed after arresting Craig and then said that he had a suspect who *had* a red hat, not one who was *wearing* a red hat. Since Craig is attempting to establish that inconsistencies between Harrah's testimony and other evidence renders Harrah incredible, presumably he is arguing that Harrah was lying and the other evidence is accurate. If the relatively minor inconsistencies resulting from the radio traffic are resolved assuming Harrah was lying, then there is further evidence buttressing probable cause because Craig was actually wearing the red hat when first observed by Harrah.

Craig also attempts to cast doubt on Harrah's statement that when Craig went into the convenience store Harrah observed that Craig had "hat hair." First, Craig points out that Harrah would have been some distance away when observing the back of Craig's head. Yet there is no statement of approximately how far the distance was or whether it could be possible to view "hat hair" from such a distance. Next, Craig places significance on the fact that on direct examination Harrah testified that a booking photo of Craig showed the "hat hair" he had observed while on cross examination he testified that the booking photo did not necessarily show the "hat hair" because Craig could have run his hand through his hair between the arrest and when he was booked. What Craig does not mention was that on direct Harrah was asked about the hair on top of Craig's head which was sticking up, so he said that showed how the hair was sticking up like he had taken a hat off. On cross-examination Harrah was asked about the back of Craig's hair in

the booking photo where there was not the obvious ring of matted hair often caused by wearing a ball cap. Even without this distinction, Harrah's testimony about whether he thought the booking photos showed Craig's "hat hair" is too far removed and too inconsequential to have any serious impact on his credibility.

The final supposed inconsistency in Harrah's testimony which Craig points to is his description about where Harrah was when he observed Craig exit the convenience store. According to Craig, on direct Harrah testified that he had already gotten out of his vehicle and observed the open beer bottle in Craig's car when Craig exited the store, but on cross stated that Craig was coming out of the store when Harrah pulled up. Craig does not explain why this inconsistency is important apart from evidently supporting Craig's argument that nothing Harrah said was credible because a few of the minor details in his testimony were arguably inconsistent. The precise timing of Craig leaving the convenience store is inconsequential. Furthermore, the minor inconsistency regarding that point is not significant enough to necessarily have a bearing on Harrah's credibility.

After detailing all these supposed problems with Harrah's credibility, Craig goes on to argue that various factors made the convenience store owner's testimony more credible. First, Craig said that the store owner did not have a motive to lie. While this is true, the magistrate judge specifically noted that he did not believe that the owner was lying but that he was giving the owner's testimony less credibility both because it was hearsay and because it was communicated, received, and re-communicated in a second language. The only other argument Craig asserts is that the owner's employee would have remembered what happened accurately

because the circumstances were unusual and involved a gun (the weapon Harrah pulled when arresting Craig). Taking the accuracy of this argument aside, it clearly illustrates that Craig is asking this court to substitute its credibility determination for the one made by the magistrate judge and adopted by the district court. This is appropriate only where the appellate court has a clear and definite impression that the credibility determination made below was a mistake. The record in this case does not support such a conclusion.

**C. Legality of the Show-up Identification**

Craig argues that the show-up identification must be suppressed both because it was the result of an illegal arrest and because the circumstances of the show-up were unduly suggestive. The former argument fails because there was probable cause for Craig's arrest, as discussed above. The district court ruled that the circumstances of the show-up did not violate Craig's Fifth Amendment due process rights. Craig challenges this conclusion by citing to divergent testimony regarding whether he was wearing the Tasmanian Devil hat during the identification and by noting that the bank manager rather than the teller, who had a better chance to see the robber's face, was brought to make the identification. However, Craig fails to establish how either or both of these factors made the identification so unduly suggestive that it violated his due process rights.

To determine whether a pre-trial identification violates a defendant's Fifth Amendment due process rights, the court must follow a two-step analysis, determining first whether the identification procedure was suggestive, and if so, whether under the totality of the circumstances, the identification was nonetheless reliable. Under such an analysis, it must be

determined whether the identification procedure is "unnecessarily suggestive and conducive to irreparable mistake in identification." *Stovall v. Denno*, 388 U.S. 293, 302 (1967). In considering the "totality of the circumstances," five factors must be weighed in determining the reliability of the identification: (1) the opportunity of the witness to view the perpetrator during the crime; (2) the witness' degree of attention to the perpetrator; (3) the accuracy of the witness's prior descriptions of the perpetrator; (4) the level of certainty demonstrated by the witness when identifying the suspect; and (5) the length of time between the crime and the identification. *United States v. Crozier*, 259 F. 3d 503, 510 (6th Cir. 2001). The district court applied this analysis and concluded that while the show-up procedure could have been considered suggestive, under the totality of the circumstances the identification was reliable.

Craig cites a number of cases which purportedly demonstrate that the show-up identification violated his due process rights. However, Craig does not cite to the two published Sixth Circuit cases which address virtually identical factual situations. In *Bruner v. Perini* a bank employee who had face-to-face contact with a robber and gave a description of the robber to police was taken to the scene of apprehension of a suspect about half hour after the robbery. *Bruner v. Perini*, 875 F.2d 531, 534-35 (6th Cir. 1989). The bank employee identified the suspect as the robber without showing any uncertainty. In *Bruner* the Sixth Circuit determined that the identification did not violate the defendant's due process rights. In *Stidham v. Wingo* the Sixth Circuit likewise held that taking a robbery victim directly to view a suspect apprehended shortly after a robbery was not impermissible. *Stidham v. Wingo*, 482 F.2d 817, 818-19 (6th Cir. 1973).

These cases are controlling.[1]

In this case, the bank manager viewed the robber's face while standing next to and slightly behind the teller, and he followed the robber across the parking lot until he lost sight of the robber. Second, the manager clearly gave his attention to the robber, as he specifically stopped and looked at him due to his recognition that something was amiss and his belief that the robber had made sexually-suggestive comments to Ms. Ricker; also, it is worth reiterating that he actually followed the robber outside and across the parking lot until he lost sight of the robber, further underscoring the manager's attention to the robber. Third, the magistrate judge noted that the manager "passed on an accurate description of the robber's clothing to the police, and it indeed was this clothing that [the] defendant was wearing when he was arrested." (JA 72). Fourth, the district court noted that the bank manager testified that he had no hesitation or doubt

---

[1] A number of other courts have also held that prompt, on-scene show-ups of suspects to witnesses are not impermissible or unduly suggestive. Prompt on-the-scene confrontation is actually consistent with good police work. *See Valtin v. Hollins*, 248 F. Supp. 2d 311, 318 (S.D.N.Y.2 003) (quoting *United States ex rel. Cummings v. Zelker*, 455 F.2d 714, 716 (2d Cir. 1972)). Police officers should not have to limit themselves to police station line-ups when "[a]n opportunity for a quick, on-the-scene identification arises." *United States v. King*, 148 F.3d 968, 970 (8th Cir. 1998). Such on-scene identifications "are essential to free innocent suspects and to inform the police if further investigation is necessary." *Id.; see also United States ex. rel. Cummings v. Zelker*, 455 F.2d at 716 ("prompt confrontation [is] desirable because it serve[s] to insure 'the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trial is fresh.'") (quoting *Bates v. United States*, 405 F.2d 1104, 1106 (D.C. Cir. 1968)); *Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir. 1987) (Immediate on-scene confrontations "[a]llow identification before the suspect has altered his appearance and while the witness' memory is fresh, and permit the quick release of innocent persons."). Moreover, handcuffs and police custody are necessary incidents of an on-the-scene identification that do not render the pre-trial identification procedure unnecessarily suggestive. *See King*, 148 F.3d at 970; *Tobias v. Portuondo,* 367 F. Supp. 2d 384, 392 (W.D.N.Y. 2004).

that Craig was the robber. Fifth, the magistrate judge noted that the bank manager made the identification only twenty minutes after Craig's arrest. In light of the fact that this application of *Crozier* unambiguously shows that the identification was reliable and the fact that the magistrate judge noted that the conflicting testimony regarding whether Craig was wearing the cap during the identification was merely "a minor, inconsequential discrepancy," the district court did not err when it denied Craig's motion to suppress the show-up identification.

### III.  CONCLUSION

For the foregoing reasons we AFFIRM the orders of the district court.